**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520)529-4262
mrusing@rllaz.com

Michael J. Rusing
State Bar No. 006617
*Attorneys for Plaintiff D.Q.S.A., LLC*
 *dba Dairy Queen of Southern Arizona*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| D.Q.S.A., LLC dba Dairy Queen of Southern Arizona,<br><br>            Plaintiff,<br><br>   vs.<br><br>American Dairy Queen Corporation,<br><br>            Defendant. | **Case No.**<br><br>VERIFIED COMPLAINT<br><br>(Assigned to: _____) |

Plaintiff D.Q.S.A., LLC dba Dairy Queen of Southern Arizona, for its Complaint against Defendant American Dairy Queen Corporation alleges as follows:

## PARTIES

1. Plaintiff D.Q.S.A., LLC dba Dairy Queen of Southern Arizona, formerly Dairy Queen of Southern Arizona, Inc., ("DQSA" or "Plaintiff") is an Arizona limited liability company with a principal place of business located at 1700 E. 11th Street, Douglas, Cochise County, Arizona 85607.

2. Mildred Louise Living Trust Dated 1995 is the sole member of DQSA with an address located in Douglas, Cochise County, Arizona.

3. Defendant American Dairy Queen Corporation ("ADQ" or "Defendant"), upon information and belief, is a Delaware corporation with a principal place of business

located at 8000 Tower, Suite 700, 8331 Norman Center Drive, Bloomington, MN 55437.

**JURISDICTION AND VENUE**

4. All acts complained of herein which give rise to DQSA's causes of action against Defendant occurred, in whole or in part, in all counties in the State of Arizona, except for Maricopa.

5. Venue is proper in this Court because DQSA's and Defendant's relationship giving rise to this action occurred, in whole or in part, in Cochise County, Arizona.

6. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because DQSA's action arises under the Federal Declaratory Judgment Act, 28 U.S.C. §2201, the parties are diverse and the amount in controversy exceeds $75,000.00.

**FACTS COMMON TO ALL COUNTS**

A. **DQSA's Agreements with ADQ For Subfranchising within Arizona Territories**

7. ADQ is the United States master franchisor for the Dairy Queen System, which includes the sale of dairy products, beverages, food products and services under various Dairy Queen trademarks including DQ Grill & Chill® and DQ® Treat stores.

8. DQ Grill & Chill® restaurants are quick service food restaurants with seating that sell soft-serve, treat, food and drink menu items, while DQ® Treat stores may offer some limited food in addition to soft-serve items.

9. DQSA offers subfranchises at authorized locations within Arizona for the operation of DQ Grill & Chill® restaurants and DQ® Treat stores.

10. DQSA operates under agreements with ADQ and its principal predecessors, McCullough's Dairy Queen, Inc. and Artik Systems, Inc., and various former territorial

2

franchisors of the Dairy Queen System.

11. In 1948, DQSA's predecessor entered into a Territorial Agreement with ADQ's predecessor, which provided exclusive rights to engage in the sale of frozen or semi-frozen dairy products within a set Arizona territory, to develop and operate retail outlets and to license others to use the trademark and trade name "Dairy Queen."

12. DQSA has conducted this business and has offered subfranchises for "Dairy Queen®" soft-serve businesses since 1948 in Cochise County, and then acquired (1) Gila, Graham, Greenlee, Pinal, Santa Cruz, and Yuma counties in April 1954, (2) Pima county in May 1960, and (3) Apache, Coconino, Mohave, Navajo and Yavapai counties in January 1976. A true and correct copy of the operative May 5, 1960 Territorial Agreement is attached as Exhibit 1.

13. As of January 1985, DQSA acquired the exclusive rights from ADQ to license subfranchisees for quick service food restaurants in all of Arizona (excluding Maricopa County and the city of Ajo, in Pima County, Arizona) in the business of "Dairy Queen." A true and correct copy of the operative January 23, 1985 "Dairy Queen" Territorial Agreement Food Service Addendum is attached as Exhibit 2.

B. **DQSA's DQ Grill & Chill and DQ Treat Operating Agreements**

14. Under the May 5, 1960 Territorial Agreement and January 23, 1985 "Dairy Queen" Territorial Agreement Food Service Addendum (together, "Territorial Agreements"), DQSA offers Dairy Queen subfranchises in authorized territories through operating agreements authorized and approved by ADQ.

15. While the Operating Agreements have changed over the years, DQSA most recently offers subfranchises through the DQ Grill & Chill Operating Agreement and DQ Treat

3

Operating Agreement. True and correct copies of these Operating Agreements are attached as <u>Exhibit 3 and 4</u>, respectively.

16. Operating Agreement §15.8(A) provides that it and the relationship of the parties are governed by the laws of the state where the subfranchisee is located, that is, Arizona.

17. Among other things, the Operating Agreements address a subfranchisee's "Modernization and Replacement" obligations within Section 5.5, which reads:

> Licensee must modernize, refurbish, or replace …. equipment… as is necessary to reasonably conform them to Territory Operator's and Company's then current standards for similarly situated new restaurants of the type developed under this agreement, upon renewal of this agreement, upon transfer of this agreement… and every 10 years or any shorter period required by the lease for the premises.

18. Under these circumstances, a subfranchisee must modernize or replace its equipment, including Electronic Point of Sale Systems ("EPOS") and Integrated Technology Platforms, only upon the earlier of its (1) 10-year remodel, (2) renewal of the franchise, or (3) upon transferring its location.

19. Further, DQSA must provide a franchise disclosure document ("FDD") to prospective subfranchisees within 14 days before offering or selling a Dairy Queen subfranchise within its territories.

20. The Operating Agreements §15.2 states: "Nothing in this Agreement, its addenda, and the application form, or in any related agreement is intended to disclaim the representations Territory Operator made in the franchise disclosure document. . . ."

21. FDD Item 8 informs applicants about modernization of equipment, including:

> You must modernize your building, premises, equipment, signage and grounds to conform to ADQ's then-current standards for a similarly situated new DQ Grill & Chill® restaurants when you renew your franchise, on transfer of the franchise under certain circumstances, and every 10 years or any shorter period required by any applicable lease or sublease for the premises.

A true and correct copy of the FDD without attachments is attached as <u>Exhibit 5</u>.

4

22. ADQ authorized and approved DQSA's Operating Agreements, including §5.5, and the FDD, including Item 8.

### C. ADQ's Requirement that DQSA Must Compel its Subfranchisees to Modernize Equipment with a New Integrated Technology Platform.

23. DQSA subfranchisees currently use EPOS Systems and related equipment as the modern equivalent of cash registers, including hardware, software, payment processing and reporting and security components that meet then applicable ADQ standards and specifications.

24. Since at least January 19, 2019, ADQ began promoting a new Integrated Technology Platform ("ITP") to modernize current EPOS Systems.

25. The upfront cost to install the new ITP system exceeds $20,000 per each subfranchisee with additional monthly costs of nearly $400 per subfranchisee for software, support, hardware and maintenance.

26. On September 21, 2021, ADQ announced to all territory operators including DQSA that ADQ "require[s] operators to order and install ITP in their locations beginning in 2022, where franchise agreements allow." A true and correct copy of the September 21, 2021 DQ Special eNews document is attached as Exhibit 6.

27. In an October 8, 2021 email to DQSA, ADQ identified forty-five DQSA subfranchisees that it believed required ITP equipment modernization, acknowledged DQSA's duty to notify them, and cautioned "[w]e recommend you review your own sublicense agreements and consult with your attorney before sending any letters." A true and correct copy of the October 8, 2021 email with the excel attachment is attached as Exhibit 7.

28. DQSA complied with ADQ's directives and, with the assistance of counsel, conducted a good faith review of its subfranchisees' Operating Agreements. It determined the

5

contracts did not require immediate ITP modernization because none of the three conditions required by §5.5 existed, *i.e.* a 10-year remodel, renewal of the franchise or location transfer.

29. Despite the October 8th email, and DQSA's determination, ADQ later told DQSA's subfranchisees directly that they must modernize their ITP equipment under threat of default of their agreements, even though DQSA was responsible for giving its subfranchisees any such notice if appropriate under the particular subfranchisee's Operating Agreement.

30. Despite ADQ's notification, DQSA's analysis, as undertaken pursuant to ADQ's directives, verified that DQSA's subfranchisees did not fall within the three triggering events identified within Operating Agreement §5.5.

31. Consistent with DQSA's undertaking and findings, by April 25th letter to its subfranchisees, DQSA relayed that it "is not going to require existing store operators to put ITP registers in at this time[,]" pursuant to Operating Agreement §5.5. A true and correct copy of the April 25, 2022 letter is attached as Exhibit 8.

32. DQSA's April 25th letter also directed subfranchisees to ADQ's "Franchise Hub" for more information about the new ITP system if they would like to voluntarily participate in the program.

33. By May 26, 2022, ADQ effectively withdrew its request as to a majority of the subfranchisees, but directed DQSA that 18 (not the original 45) DQSA subfrancisees must modernize their equipment and execute an agreement by July 31, 2022 for ITP installation by March 31, 2023. This despite none of the 18 subfranchisees falling within the three circumstances under Operating Agreement §5.5. A true and correct copy of the May 26th e-mail is attached as Exhibit 9.

6

34. In the same e-mail, while effectively ignoring §5.5, ADQ threatened DQSA: "failure to enforce these deadlines could lead to default of your Territory Agreements." Id.

35. DQSA replied that, consistent with Section 5.5 and FDD Item 8, "it struggles to see how it can in good faith and consistent with its obligations to the Sublicensees impose a requirement to purchase this system when neither it, nor IDQ[/ADQ], have the ability to contractually require it except as previously indicated in the [April 25th] letter sent to them." A true and correct copy of the June 10, 2022 letter is attached as Exhibit 10.

36. By June 28, 2022 letter, ADQ did not address the substance of Section 5.5 and Item 8 but, instead, detailed its "disappointment" with DQSA and again threatened termination of the Territorial Agreements: "As I stated earlier, this refusal to support ADQ's initiative could lead to a default of the territory agreements." A true and correct copy of the June 28, 2022 letter without attachments is attached as Exhibit 11.

37. By letter of July 12, 2022, DQSA sought final clarification from ADQ as to how Operating Agreement §5.5, as also reflected in FDD Item 8, would permit compelling subfranchisees to replace equipment, including the ITP, when prerequisites of franchise agreement renewal, transfer of a franchise or the passage of ten years since the last modernization do not exist. A true and correct copy of the July 12, 2022 letter is attached as Exhibit 12.

38. Days later, on July 15th, ADQ e-mailed many of DQSA's subfranchisees "a final reminder to take action regarding DQ's mandated Integrated Technology Platform (ITP) implementation." A true and correct copy of the July 15th e-mail is attached as Exhibit 13.

7

39. By letter on July 18, 2022, ADQ maintained its position that DQSA must enforce the subfranchisees' modernization of equipment despite Operating Agreement §5.5. A true and correct copy of the July 18th letter without attachments is attached as <u>Exhibit 14.</u>

40. Despite good faith efforts, DQSA and ADQ are at an impasse and there exists an irreconcilable conflict between them regarding the interpretation of Operating Agreement §5.5 and the duties and obligations arising therefrom, which requires this Court's intervention.

**COUNT I**
**(Declaratory Judgment - 28 U.S.C. §2201)**

41. Plaintiff re-alleges and incorporates the allegations above herein.

42. The Declaratory Judgment Act, 28 U.S.C. §2201(a) provides in pertinent part:

> In a case of actual controversy within its jurisdiction, . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

43. DQSA has a practical interest in the declaration sought and all parties having an interest therein or adversely affected are named herein.

44. There exists a controversy between DQSA and Defendant that is of a justiciable nature, and which does not seek an advisory decree upon hypothetical facts.

45. This Court may declare the existence or nonexistence of the parties' rights, duties, powers, privileges or of any fact upon which such legal relations depend, or of a status, under the Territorial Agreements and Operating Agreements.

46. As such, DQSA seeks a judicial declaration of its rights under the Territorial Agreements that Operating Agreement §5.5 and FDD Item 8, authorized and approved by Defendant, then offered and entered by DQSA with its subfranchisees, only mandate

installation of new equipment, including ITP, upon the earlier of the 10-year remodel, renewal of the subfranchise, or upon transferring the subfranchise location.

47.  If *arguendo*, the Court determines that ADQ may compel DQSA to enforce its subfranchisees' installation of new ITP equipment irrespective of Operating Agreement §5.5 and FDD Item 8, in the alternative DQSA seeks a judicial declaration that the time for any such subfranchisees to execute an ITP agreement is extended for a period of sixty days after entry of a Final Order with ITP installation to be completed two hundred and forty days from execution of the ITP agreement consistent with the timeframe in the May 26th ADQ correspondence.

48.  DQSA requests the Court order a speedy hearing of the declaratory judgment action under Fed. R. Civ. P. 57, and submits this controversy may be decided upon dispositive motion without discovery.

**COUNT II**
**(Injunctive Relief)**

49.  Plaintiff re-alleges and incorporates the allegations above herein.

50.  Unless enjoined and restrained by order of this Court pursuant to Rule 65, ADQ's conduct in violating Operating Agreement §5.5 will cause irreparable injury to DQSA by undermining DQSA's contractual rights and infringing upon DQSA's business relationship with its subfranchisees. The subfranchisees' businesses, in turn, will be injured or even lost because their rights are derived through their contractual relationship with DQSA.

51.  The May 5, 1960 Territorial Agreement provides that "in the event of breach or threatened breach of any terms of this Agreement by either party, the other party shall forthwith be entitled to an injunction restraining such breach without showing or proving any actual damages. . . ." Exhibit 1, §18.

52.  The January 23, 1985 "Dairy Queen" Territorial Agreement Food Service Addendum provides "in the event of a breach or threatened breach of any of the terms of this

9

Agreement by either party, the other party shall forthwith be entitled to an injunction restraining such breach and/or a decree of specific performance, pending final adjudication or resolution of the matter, without showing or proving any actual damage. . . ." Exhibit 2, §8.1.

53. DQSA has no adequate remedy at law for ADQ's actions attempting to compel or otherwise coerce DQSA to breach the Operating Agreements with its subfranchisees in light of ADQ's threats to declare a default and end DQSA's seventy-four-year-old business if DQSA does not capitulate to ADQ's demands.

54. DQSA has no adequate remedy at law for the erosion of its relationship with subfranchisees and their loyalty to the DQ System that will result from ADQ's actions, which once lost is not easily regained. The monetary value of lost customer goodwill is also impossible to quantify.

55. The balance of the equities lies with DQSA, which seeks to enforce the plain language of contracts with ADQ and its subfranchisees free from the interference by ADQ.

56. Public interest is served by enjoining ADQ from acting to impose ITP mandates upon DQSA and, in turn, its subfranchisees, absent the occurrence of three contractual prerequisites in agreements authorized and approved by ADQ.

57. The public interest is further served by maintaining the operating *status quo* for DQSA and, in turn, its subfranchisees. ADQ proceeding with its repeatedly threatened default against DQSA would result in its over forty subfranchisees losing their businesses because their rights are derived through contractual relationship with DQSA. Hundreds of the subfranchisees' employees would be out of work and communities would no longer be served.

58. Plaintiff is entitled to recover attorney's fees and costs pursuant to A.R.S. §§ 12-341.01 and 12-341, Section 18 of the 1960 Territorial Agreement, and Section 8.1 of the 1985 Territorial Agreement Food Service Addendum.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff DQSA prays that the Court award it the following relief:

a. Judgment in Plaintiff's favor declaring that Operating Agreement §5.5 and FDD Item 8, between DQSA and its subfranchisees only mandate installation of new equipment, including ITP, upon the earlier of the 10-year remodel, renewal of the subfranchise, or transferring the subfranchise location;

b. In the alternative, if the Court determines that ADQ may compel DQSA to enforce its subfranchisees' installation of new ITP equipment, DQSA seeks a Judgment that the time for any such subfranchisees to execute an agreement is extended for a period of sixty days from entry of a Final Order with ITP installation to be completed two hundred and forty days from execution of that agreement;

c. That the Court preliminarily and then permanently enjoin ADQ from taking action against DQSA relating to the enforcement of ADQ's new ITP requirements or interfering with DQSA's relationship with its subfranchisees, including but not limited to prohibiting ADQ from declaring DQSA in default under the parties' agreements, taking action to terminate those agreements or doing anything to impair or impede DQSA's subfranchisees' operations of individual Dairy Queen stores or outlets throughout Arizona, absent the occurrence of the 10-year remodel, renewal of the subfranchise, or transferring the subfranchise location as provided for in Operating Agreement §5.5 and FDD Item 8;

d. Award of attorneys' fees and costs pursuant to A.R.S. §§ 12-341.01 and 12-341, Section 18 of the 1960 Territorial Agreement, and Section 8.1 of the 1985 Territorial Agreement Food Service Addendum;

e. Any other and further relief as the Court deems just and equitable.

DATED this 29th day of July, 2022.

**RUSING LOPEZ & LIZARDI, P.L.L.C.**

*/s/ Michael J. Rusing*
Michael J. Rusing
*Attorneys for Plaintiff D.Q.S.A., LLC
dba Dairy Queen of Southern Arizona*

58022168_1

**VERIFICATION**

STATE OF ARIZONA     )
                    )
COUNTY OF COCHISE    )

My name is Patrick W. Hanigan. I am of legal age and competent to testify in Court. I am the Managing Member of Plaintiff D.Q.S.A., LLC dba Dairy Queen of Southern Arizona, an Arizona limited liability company with its principal place of business in Cochise County, Arizona. I have read the Verified Complaint dated this 29th day of July 2022, and hereby verify that the matters stated therein are either true or are not within my personal knowledge and have been assembled by authorized employees and counsel of Plaintiff; and that I am informed and, upon information and belief verify that the facts stated therein are true.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 29th day of July, 2022 in Cochise County, Arizona.

_____
PATRICK W. HANIGAN