**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| D.Q.S.A. LLC, dba Dairy Queen of Southern Arizona,<br><br>    Plaintiff,<br><br>v.<br><br>American Dairy Queen Corporation,<br><br>    Defendant. | No. CV-22-00335-TUC-JGZ<br><br>**ORDER** |

   In this action, Plaintiff DQSA LLC seeks a declaratory judgment regarding its contractual obligations. Specifically, DQSA requests the Court declare that, under the operating agreements between DQSA and its subfranchisees, Defendant American Dairy Queen Corporation (ADQ) cannot compel the subfranchisees to immediately replace their existing electronic point-of-sale cash register system (EPOS System) with a new Integrated Technology Platform (ITP). (Doc. 33 at 2.) In opposing DQSA's requested relief and relying on different contractual provisions, ADQ seeks an order requiring DQSA to compel ITP installation at two types of its subfranchisees: those operating under certain newer form operating agreements and those authorized to serve food. (Doc. 44 at 11.) The parties agree that the interpretation of the relevant contracts is a legal issue appropriate for resolution by motion for summary judgment and have filed cross-motions for summary judgment, which are fully briefed. (Docs. 33, 34, 44–48.) Oral argument was held on June 15, 2023. For the following reasons, the Court will grant ADQ's cross-motion for summary judgment and deny DQSA's motion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      Background[1]

Defendant ADQ is the United States master franchisor for the Dairy Queen System, which includes the sale of dairy products, beverages, and food products and services under various Dairy Queen trademarks, such as the DQ Grill & Chill® and DQ® Treat stores. (Docs. 34 ¶ 1; 45 ¶ 1.) DQ Grill & Chill® locations are quick-service food restaurants with seating that sell food, drink, and soft-serve and treat menu items. (Docs. 34 ¶ 2; 45 ¶ 2.) DQ® Treat stores offer soft-serve ice cream and some limited food items. (*Id.*)

Plaintiff DQSA is a Dairy Queen Territory Operator. (Docs. 45 ¶ 51; 47 ¶ 51.) It offers subfranchises for the operation of DQ Grill & Chill® restaurants and DQ® Treat stores at authorized locations in Arizona. (Docs. 34 ¶ 3; 45 ¶ 3.)

### A.      ADQ and DQSA's Agreements

DQSA operates under agreements between its predecessors and ADQ's predecessors that date back to the 1940s. (Docs. 34 ¶¶ 4–5; 45 ¶¶ 4–5.) In 1960, the parties' predecessors entered into two Territory Agreements, authorizing DQSA to enter into subfranchise agreements with Dairy Queen franchisees within specific territories in Arizona. (Docs. 45 ¶ 51; 47 ¶ 51; *see also* Doc. 1-2.) One of the 1960 Territory Agreements gave DQSA the exclusive right to use and sublicense the "Dairy Queen" trademark for the sale of frozen dairy product within the specified territory. (Docs. 45 ¶ 51; 47 ¶ 51; *see also* Doc. 1-2.) In 1985, pursuant to the Food Service Agreement (FSA), DQSA acquired from ADQ the exclusive right to license subfranchisees for quick-service "Dairy Queen" food restaurants throughout most of Arizona. (Docs. 34 ¶ 9; 45 ¶ 9; *see also* Doc. 1-3.) According to the terms of the FSA, in the event of any inconsistency between the 1960 Territory Agreements and the FSA, the Territory Agreement governs "the '***dairy products***' aspect" and the FSA governs the "'***food service***' aspect of Licensee's or [its] sublicensees' 'Dairy Queen' business." (Docs. 34 ¶ 11; 45 ¶ 11 (emphasis added); *see also* Doc. 1-3 at 5 (FSA Section 1.3).) Further, the FSA states that DQSA "shall be responsible for actively enforcing the standards and requirements of such sublicensee agreements." (Docs. 34 ¶ 12;

---

[1]  The facts in this background section are undisputed unless otherwise noted.

45 ¶ 12; *see also* Doc. 1-3 at 9 (FSA Section 4).)

### B.   DQSA and its Subfranchisees's Agreements

At the end of 2020, DQSA had over 54 authorized Dairy Queen subfranchisees within its territories. (Docs. 34 ¶ 14; 45 ¶ 14.) A number of DQSA's subfranchisees have entered into agreements similar to ADQ's current form operating agreements (Newer Form Operating Agreements). (Docs. 45 ¶ 59; 47 ¶ 59.) ADQ's Newer Form Operating Agreements include its DQ Grill & Chill Operating Agreement and DQ Treat Operating Agreement. (Docs. 34 ¶ 15; 45 ¶¶ 15, 55; *see, e.g.*, Doc. 1-4 (DQ Grill & Chill); Doc. 1-5 (DQ Treat).) Other DQSA subfranchisees operate under older agreements (Older Form Operating Agreements). (Docs. 45 ¶ 60; 47 ¶ 60.) DQSA's agreements with its subfranchisees—both the Newer and Older Form Operating Agreements—may vary from subfranchisee to subfranchisee. (Docs. 45 ¶¶ 59–60; 47 ¶¶ 59–60.) Any subfranchisee serving food operates under either a Newer Form Operating Agreement or an Older Form Operating Agreement and a Food Service Addendum between DQSA and the subfranchisee. (Docs. 45 ¶ 61; 47 ¶ 61; Oral Argument; *see also* Doc. 34-1 at 7–23 (Older Form); *id.* at 32–48 (Food Service Addendum).)

### C.   Newer Form Operating Agreement

The Newer Form Operating Agreement consists of sixteen sections, including: Section 3, Trademark Standards and Requirements; Section 5, Facility Standards and Maintenance; Section 6, Products and Operations Standards and Requirements; Section 15, General Provisions; and Section 16, Definitions. (Doc. 1-5 at 4–6.)

Section 3.2 provides ADQ with control over the products and services subfranchisees provide under Dairy Queen trademarks:

> **3.2 Trademark Use.** Licensee may only use the Trademarks in connection with the Restaurant, and must not use, or permit the use of, any other trademarks, trade names or service marks. ***Licensee must use the Trademarks, in the form and manner prescribed by Company in writing, only in connection with the products and services specified or approved periodically by Company*** that meet Company's standards of quality, mode and condition of storage, production and sales, and portion and packaging. . . . ***Licensee acknowledges the value of System uniformity and agrees that Licensee's failure to comply with the System will adversely affect the value of the Trademarks***.

(Doc. 1-5 at 9 (emphasis added).)

Section 5.5 requires complete modernization, including building replacement, in at least three circumstances: the earliest of every 10 years, franchise renewal, or franchise transfer:

> **5.5 Modernization and Replacement.** *Licensee must modernize, refurbish or replace* the building, premises, *equipment*, signage and grounds as is necessary to reasonably conform them to Territory Operator's and Company's then current standards for similarly situated new restaurants of the type developed under this agreement, *upon renewal of this agreement, upon transfer of this agreement . . . , and every 10 years or any shorter period required by the lease for the premises.* The requirements of this section 5.5 are reasonable and necessary to ensure continued public acceptance and patronage of DQ® restaurants and to avoid deterioration or obsolescence in connection with the operation of the business.

(*Id.* at 13 (emphasis added).)

Sections 6.4(A) and 6.5(A) discuss which equipment subfranchisees may use and the EPOS System:

> **6.4 Approved Products, Services, and Equipment.**
>
> (A) Company or Territory Operator will periodically publish lists of approved products (including ingredients of approved products), approved services, and approved equipment (including an approved menu board system (dine in and drive-thru, if applicable)). *Licensee must use only the* approved products, approved services, and *approved equipment in the Restaurant described in the approved* products, services, and *equipment lists, as they may be periodically modified by Company.* Licensee may not test, offer, or sell any new or unapproved products without Company's prior written consent. . . .
>
> **6.5 EPOS System, Computer Systems, and Internet.**
>
> (A) **EPOS System and Computer Systems.** *Licensee must purchase, install and maintain at its own expense an EPOS System and the Computer Systems at the Restaurant. Licensee must purchase the EPOS System and Computer Systems from a source or sources designated by Company.* Company may designate a single source from whom Licensee must purchase the EPOS System or Computer Systems, and any components thereof or associated service. As part of the EPOS System or Computer Systems, Licensee may be required to license software from Company, an affiliate or a third party, and Licensee also may be required to pay a software licensing or user fee and support fee in connection with Licensee's use of the EPOS System or Computer Systems. Licensee periodically may be required to enter into license agreements related to Licensee's use of components of the EPOS System or Computer Systems. *Licensee will be required to use and, at Company's discretion, pay for all future updates, supplements and modifications to the EPOS System or Computer Systems.*

1

(*Id.* at 14–15 (emphasis added).)

2

Section 15.13 establishes that ADQ may modify its standards under the Newer Form

3

Operating Agreement to respond to business and technological change:

4

**15.13 Adaptions and Variances.** . . . *Territory Operator or Company may periodically modify or rescind any requirement, standard or specification* prescribed by Territory Operator or Company under this agreement to adapt the System to changing conditions, competitive circumstances, business strategies, business practice innovations, and technological changes as Territory Operator or Company deems appropriate.

5

6

7

8

(*Id.* at 43 (emphasis added).)

9

Section 16, Definitions, provides the meaning of the terms "System" and

10

"equipment":

11

**16.20 System** means the DQ® system which consists of the sale of distinctive dairy products, beverages, food products and other products and services under the Trademarks using distinctive facilities, *equipment (including the EPOS System and Computer Systems)*, supplies, ingredients, secret and proprietary formulas, business techniques, methods, procedures, standards, specifications, and Operations Manual, together with sales promotion programs, as may be modified and improved periodically by Company.

12

13

14

15

16

(*Id.* at 46 (emphasis added).)

17

**D.   FSA**

18

The 1985 FSA, between ADQ and DQSA, provides DQSA the exclusive right to

19

license quick-service Dairy Queen food restaurants throughout most of Arizona. (Docs. 34

20

¶ 9; 45 ¶ 9; *see also* Doc. 1-3.) The FSA requires DQSA to enforce ADQ's standards of

21

operations on DQSA's subfranchisees:

22

3.1 Uniform Trademark Protection Standards. *Licensee shall conduct his business and shall require his sublicensees to conduct their respective businesses in accordance with Company's system standards* and requirements pertaining to Trademark usage, product quality and production, facility and equipment cleanliness, maintenance and appearance, service standards, method of operation and sales promotion.

23

24

25

26

. . .

27

3.2 Equipment and Supplies. *Licensee agrees to purchase and use, and to require that sublicensees likewise agree to purchase and use,* in the operation of the business conducted by Licensee and in the operation of all retail stores operated by sublicensees of Licensee, *only equipment*, supplies and ingredients which are *approved by Company*.

28

- 5 -

. . .

3.3 <u>Approved Adaptions.</u> . . . ***Licensee further acknowledges and agrees that any requirement, standard or specification prescribed by Company hereunder is subject to reasonable periodic modification*** or rescission by Company as may be necessary in Company's reasonable judgment to adapt the System to changing conditions and competitive circumstances.

(Doc. 1-3 at 7–8 (emphasis added).)

## E.    The Integrated Technology Platform

In January 2019, ADQ introduced the ITP as the only approved EPOS System for use by Dairy Queen restaurants and stores in the United States.[2] (Docs. 34 ¶ 30; 45 ¶ 30; Oral Argument.) ADQ currently requires two categories of DQSA subfranchisees to adopt the ITP: (1) any subfranchisee operating pursuant to a Newer Form Operating Agreement; and (2) any subfranchisee authorized to serve food.[3] (Docs. 45 ¶ 74; 47 ¶ 74.)

The parties agree ADQ can require that DQSA compel its subfranchisees to install the ITP. (Docs. 46 at 4; 48 at 6; Oral Argument.) The parties dispute *when* ADQ can require installation. (Docs. 46 at 4; 48 at 6; Oral Argument.) DQSA argues that the modernization sections of the Newer and Older Form Operating Agreements govern this dispute. (Doc. 33 at 2.) These modernization sections, according to DQSA, only permit ADQ to require that subfranchisees install new equipment, like the ITP, when specific triggering events occur, such as a 10-year remodel, franchise renewal, or franchise transfer. (*Id.*) ADQ argues the Newer Form Operating Agreements and FSA permit ADQ to determine and periodically modify what equipment subfranchisees may use. (Doc. 48 at 6, 16.) For ADQ, this means it can immediately require that DQSA compel its subfranchisees to replace their existing EPOS System with the new ITP. (*Id.*) The parties agree this issue can be resolved through summary judgment because this case turns on the legal interpretation of contracts and there are no genuine issues of material fact. (*See* Docs. 33 at 10; 44 at 12.) The Court has jurisdiction over this action under 28 U.S.C. § 1332.

---

[2]  For some stores in specific locations, ADQ has not made ITP available or has otherwise exempted those stores from the required ITP installation. (Docs. 33 at 12 n.3; 44 at 11 n.3.)

[3]  ADQ reserves the right to enforce ITP at more locations in the future. (Doc. 45 ¶ 74.)

## II.     Summary Judgment Standard

Summary judgment will be granted when the movant has shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *Id.* A court presented with cross-motions for summary judgment should review each motion separately, giving the nonmoving party for each motion the benefit of all reasonable inferences from the record. *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006).

## III.     Discussion

Under Arizona law, the interpretation of a contract is a question of law for the court to decide. *Rand v. Porsche Fin. Servs.*, 167 P.3d 111, 121 (Ariz. Ct. App. 2007). When parties bind themselves by a lawful contract, with clear and unambiguous terms, the court must give effect to the contract as written. *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C.*, 138 P.3d 1210, 1213 (Ariz. Ct. App. 2006). The ultimate aim of contract interpretation is to determine and enforce the parties' intent. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1138 (Ariz. 1993). To determine the parties' intent, the court first considers the plain meaning of the words as viewed in the context of the entire contract. *Grosvenor Holdings, L.C. v. Figueroa*, 218 P.3d 1045, 1050 (Ariz. Ct. App. 2009). The court may not modify, extend, or rewrite an agreement when the parties express their intent in clear and unambiguous language. *Mining Inv. Grp., LLC v. Roberts*, 177 P.3d 1207, 1211 (Ariz. Ct. App. 2008).

The reading of one contract provision must not render a related provision meaningless. *Aztar Corp. v. U.S. Fire Ins. Co.*, 224 P.3d 960, 973 (Ariz. Ct. App. 2010). Rather, the court must read each part of a contract together and bring harmony, to the extent possible, between all parts of the contract. *Gesina v. Gen. Elec. Co.*, 780 P.2d 1380, 1386

1  (Ariz. Ct. App. 1988). To the extent specific provisions might be inconsistent with general

2  provisions, specific provisions qualify the meaning of general provisions because specific

3  provisions express the parties' intent with more precision. *See ELM Ret. Ctr., LP v.*

4  *Callaway*, 246 P.3d 938, 942 (Ariz. Ct. App. 2010). The Court applies these rules in

5  interpreting the (1) the Newer Form Operating Agreements and (2) the FSA.[4]

6          **A.**      **Newer Form Operating Agreements**

7          The plain terms of the Newer Form Operating Agreements permit ADQ to set and

8  periodically update its mandatory system standards, including its standards for approved

9  equipment and the EPOS System. ITP is currently ADQ's only approved EPOS System in

10  the United States. And although the Newer Form Operating Agreements are between

11  DQSA and its subfranchisees, the parties do not dispute that ADQ has a right to enforce

12  the agreement's terms as an intended third-party beneficiary.[5] ADQ can therefore

13  immediately require ITP installation from subfranchisees that signed this agreement.

14          Under the Newer Form Operating Agreements, subfranchisees agreed that: ADQ

15  "will periodically publish lists of . . . approved equipment." (Doc. 1-5 at 14 (Section 6.4).)

16  Subfranchisees also agreed that they "***must use only the . . . approved equipment . . .***

17  ***described in the approved . . . equipment lists, as they may be periodically modified by***

18  ***[ADQ].***" (*Id.* (emphasis added).) In the definition section of these agreements, ADQ

19  defines the term "System" to include the "equipment" used to provide Dairy Queen

20  products, "including the EPOS System and Computer Systems." (*Id.* at 46 (Section 16.20).)

21  The plain language of these agreements establishes that ADQ determines, and can

22  

23    [4]  Not all of these agreements are governed by Arizona law; the FSA, for instance, states it

24  is governed by Minnesota law. (Docs. 1-3 at 19; 45 ¶ 63; 47 ¶ 63.) However, the parties agree that all applicable state law utilizes the same principles of contract interpretation.

25  (Docs. 33 at 11; 44 at 13 n.15.)

26    [5]  ADQ argues it has a right to enforce the operating agreements between DQSA and its subfranchisees as an intended third-party beneficiary, (*see* Doc. 44 at 14 n.6), which DQSA

27  does not dispute, (*see* Doc. 46). ADQ's position is consistent with traditional principles of contract law as well as Arizona law. *See Supplies for Indus., Inc. v. Christensen*, 659 P.2d

28  660, 662 (Ariz. Ct. App. 1983) (citing *Restatement (Second) of Contracts* §§ 302, 304 (Am. L. Inst. 1981)).

periodically modify, what equipment subfranchisees may use, including the EPOS System. Indeed, the agreements say subfranchisees must use **only** equipment approved by ADQ, with no conditions precedent or grace period during which subfranchisees may use unapproved equipment. The ITP, as the EPOS System, is specifically included under the umbrella of equipment.

Further bolstering this reading of the agreements are various contractual provisions that repeat ADQ's right to set and periodically modify its system standards. Under the agreements, subfranchisees "must use the [Dairy Queen] Trademarks, in the form and manner prescribed by [ADQ] in writing, only in connection with the products and services specified or approved **periodically** by [ADQ]." (*Id.* at 9 (Section 3.2) (emphasis added).) The agreements also require subfranchisees to "comply with the required standards, procedures, techniques, and management systems described in [ADQ's] Operations Manual," (*Id.* at 17 (Section 6.10)), and state ADQ "may add to, and otherwise **modify**, the Operations Manual to reflect changes in . . . required . . . specifications, standards and operating procedures of a DQ® restaurant," (*Id.* at 18 (Section 6.11) (emphasis added)). Section 15.13 similarly states that "[ADQ or DQSA] may **periodically modify** or rescind any requirement, standard or specification prescribed by [ADQ or DQSA]." (*Id.* at 43 (emphasis added).) Reasons for periodic modifications include "competitive circumstances" and "technological changes." (*Id.*) What is more, a subfranchisee operating under one of these agreements must agree to "purchase, install and maintain at its own expense an EPOS System . . . . from a source or sources designated by [ADQ]." (*Id.* at 15 (Section 6.5).)

DQSA contends these provisions fail to address *when* subfranchisees must replace their now unapproved EPOS System with the new ITP. (*See* Doc. 33 at 12; 46 at 7, 10–11.) The answer to that question, argues DQSA, is found in Section 5.5:

1
2
3
4

> **5.5 Modernization and Replacement.** *Licensee must modernize, refurbish or replace* the building, premises, *equipment*, signage and grounds as is necessary to reasonably conform them to [DQSA's and ADQ's] then current standards for similarly situated new restaurants of the type developed under this agreement, *upon renewal of this agreement, upon transfer of this agreement . . . , and every 10 years* or any shorter period required by the lease for the premises.

5
6
7
8

(Doc. 1-5 at 13 (emphasis added); *see also* Doc. 33 at 10, 12.) DQSA interprets this provision as prohibiting ADQ from requiring that subfranchisees replace their EPOS System unless one of three conditions are met: a subfranchisee (1) has its 10-year remodel; (2) renews its franchise agreement; or (3) transfers its agreement. (Doc. 33 at 10–11.)

9
10
11
12
13
14
15
16
17
18
19
20
21

Such a reading of Section 5.5, however, is inconsistent with the rules of contract interpretation. DQSA's proposed interpretation would in fact undermine ADQ's express authority in Section 6.4 to limit what equipment subfranchisees may use. (*See* Doc. 1-5 at 14.) For example, Section 6.4 states "[ADQ or DQSA] will periodically publish lists of . . . approved equipment . . . including an approved menu board system." (*Id.*) It also states that subfranchisees "must use only the . . . approved equipment . . . described in the approved . . . equipment lists, as they may be periodically modified by [ADQ]." (*Id.*) If Section 6.4 means what it says, subfranchisees may use only ADQ-approved menu board systems, even when ADQ periodically modifies which menu board systems are approved. Yet, under DQSA's interpretation of Section 5.5, that is not the case: a subfranchisee could use an unapproved menu board system for up to 10 years.[6] This would mean—contrary to Section 6.4—that subfranchisees *can* use unapproved equipment and *need not* comply, for as long as 10 years, when ADQ periodically modifies its approved equipment lists.

22
23
24
25

Another provision that conflicts with DQSA's interpretation is Section 5.3. This provision requires subfranchisees to repair or replace obsolete items within 90 days after receiving an evaluation report from ADQ or DQSA:

26
27
28

---

[6] DQSA contends two other events—franchise renewal and transfer—would also trigger the subfranchisees' obligation to modernize and comply with ADQ's modified equipment lists. (Doc. 33 at 4.) Franchise renewal occurs every 20 years, (Docs. 1-4 at 10; 1-5 at 10), and there is no requirement that subfranchisees ever transfer their agreement, (*see* Docs. 1-4 at 30–34; 1-5 at 30–33).

**5.3 Maintenance.** Licensee must maintain the building, premises, grounds, equipment, and signage used in the operation of the Restaurant in good condition and in accordance with requirements established periodically by [DQSA and ADQ], and . . . based upon periodic evaluations of the premises by [DQSA]'s representatives. ***Within 90 days after the receipt of a report based on an evaluation***, ***Licensee must effect the items of maintenance*** designated in the report, ***including the*** repair of defective items or the ***replacement of irreparable or obsolete items of equipment*** and signage.

(Doc. 1-5 at 12 (emphasis added).) According to DQSA's interpretation, this provision in no way dictates *when* subfranchisees must install ITP. (*See* Doc. 46 at 7.) The timing of modernization, argues DQSA, rests solely in Section 5.5. (Doc. 33 at 10–12.) Yet, the plain and unambiguous language of Section 5.3 permits ADQ and DQSA to compel subfranchisees to replace obsolete equipment within 90 days. This language undermines DQSA's position that subfranchisees need *only* replace equipment when they complete their 10-year remodel, renew their franchise agreement, or transfer their agreement.

Sections 5.3 and 6.4 can be read in harmony with Section 5.5, however, when Section 5.5 is read as a baseline duty of modernization for subfranchisees rather than a limit on ADQ's authority to require equipment replacement at any other time. Section 5.5 begins with "Licensee must modernize . . . ," framing itself as a duty for subfranchisees. (*See* Doc. 1-5 at 13.) Section 5.5 then establishes conditions that prompt this duty to modernize—replacing everything from buildings to equipment—but does not state that subfranchisees must *only* replace equipment when those listed conditions are met. (*Id.*) Reading each part of the agreement together to bring harmony between all parts, *see Gesina*, 780 P.2d at 1386, Section 5.5 requires subfranchisees to replace equipment at specific times while leaving room for other provisions, such as Sections 5.3 and 6.4, to mandate the replacement of equipment more frequently and under separate conditions.[7]

This reading of the agreements is also consistent with the well-settled principle that the specific governs the general. At issue here is the installation of ITP, ADQ's new EPOS System. Section 5, however, is entitled "Facility Standards and Maintenance" and does not mention the EPOS System. (*See* Docs. 1-5 at 11–13.) Although Section 5 references

[7] *Compare* Doc. 1-5 at 13 (Section 5.5), *with id.* at 12 (Section 5.3), *and id.* at 14 (Section 6.4).

equipment, its overall focus is the restaurant facility (Section 5.1) and related alterations (5.2), maintenance (5.3), relocation (5.4), modernization or replacement (5.5), and lease (5.6). (*Id.*) Section 6, by contrast, specifically addresses equipment and the EPOS System. (*Id.* at 14–15.) Section 6.4 also mentions both, stating that subfranchisees must use only equipment on ADQ's approved equipment lists, even when ADQ periodically modifies those lists. (*Id.* at 14.) And Section 6.5, "EPOS System, Computer Systems, and Internet," discusses the EPOS System in more depth than any other provision in the agreements. (*Id.* at 15.) It also requires that subfranchisees purchase, install, and maintain—at their own expense—ADQ's designated EPOS System. (*Id.*) Relative to Section 5.5, these provisions in Section 6 more precisely express the parties' intent as to when ADQ may require that subfranchisees install the EPOS System. *See ELM Ret. Ctr.*, 246 P.3d at 942.

DQSA argues this reading of the agreements renders Section 5.5 meaningless because "no conceivable facts exist where Section 5.5 could possibly be a 'floor' for the timing of a subfranchisee's installation of new ITP." (Doc. 46 at 12–13.) Yet, as discussed above, Section 5 does not specifically address the EPOS System at all. Rather, it allows ADQ to require that subfranchisees "replace the building, premises, equipment, signage and grounds." (Doc. 1-5 at 13.) Even if Section 5.5 would never address the timing of ITP installation, that would not render it meaningless because Section 5.5 permits ADQ to require that subfranchisees replace far more than an EPOS System, including entire buildings.

DQSA also contends that ADQ's Financial Disclosure Document (FDD) informs prospective subfranchisees that they need only modernize their equipment every 10 years, upon franchise renewal, or upon franchise transfer. (Doc. 33 at 5.) The FDD, DQSA argues, supports DQSA's interpretation of the Newer Form Operating Agreements. (*Id.*) But the FDD only reflects Section 5.5, the modernization provision in the Newer Form Operating Agreements. (*Compare* Doc. 1-7 at 4 (FDD Item 8), *with* Doc. 1-5 at 13 (Section 5.5).) Like Section 5.5, the FDD begins by informing potential subfranchisees of the duty to modernize: "You must modernize your building, premises, equipment, signage and

grounds." (Doc. 1-7 at 4.) The FDD, similar to Section 5.5, states specific events which will trigger the duty to modernize but does not state these events are the *only* time when subfranchisees must replace equipment. (*Id.*) And, consistent with the Newer Form Operating Agreements, the FDD informs potential subfranchisees that they may use only products approved by ADQ. (*Id.*) The FDD defines products as including equipment and the EPOS System and warns subfranchisees that ADQ "has the right to periodically change the list of approved products." (*Id.*) If anything, the FDD confirms that ADQ, DQSA, and the subfranchisees intended to provide ADQ with the right to immediately require that subfranchisees use only ADQ-approved equipment, even when ADQ periodically changes which equipment meets its standards.

Finally, DQSA presents three arguments that challenge ADQ's reliance on the Operations Manual when requiring ITP installation. These arguments are unpersuasive because the plain terms of the Newer Form Operating Agreements provide ADQ with the right to immediately require that DQSA enforce ITP installation. Even so, the Court will address each of DQSA's arguments. First, DQSA argues that reliance on the Operations Manual is improper because the Operations Manual did not identify or define the ITP when ADQ first demanded its installation. (Doc. 46 at 8.) Yet DQSA does not contend that it or its subfranchisees are unaware of the ITP or how to install it. Nor does DQSA dispute whether the current Operations Manual designates the ITP as ADQ's approved EPOS System.

Second, DQSA argues that the Operations Manual, if considered, supports DQSA's interpretation of the Newer Form Operating Agreements. (*Id.* at 10.) DQSA points to Article V of the Operations Manual, Modernizations, which states "[i]f your agreement does not contain a modernization provision, you will not be required to modernize." (Doc. 50 at 13 (Section 5.02).) Article V, however, mentions neither equipment nor the EPOS System; its focus centers on facility renovations. (*Id.*) The relevant provision of the Operations Manual is Section 3.06, Equipment, which states, consistent with the Newer Form Operating Agreements, that subfranchisees "must purchase, install and use the ITP."

(*Id.* at 11.) The Operating Agreement does not support DQSA's interpretation.

Third, DQSA argues the Operations Manual's ITP-installation requirement unilaterally revises the Newer Form Operating Agreements by negating Section 5.5's express terms, citing in support *Bird Hotel Corp. v. Super 8 Motels, Inc.*, No. CIV 06–4073, 2010 WL 572741 (D.S.D. Feb. 16, 2010). (Doc. 46 at 8–9.) The Operations Manual, however, does not unilaterally revise or negate Section 5.5, which establishes some *but not all* instances when subfranchisees must refurbish or replace equipment.[8] The holding in *Bird Hotel Corp.* is therefore inapposite. In *Bird Hotel Corp.*, the owner and its franchisees entered into an operating agreement stating the franchisees would pay a franchise fee of 2 percent of all gross room sales. 2010 WL 572741 at *3. The owner attempted to raise this fee to 7 percent to fund a new rewards program, relying on provisions of the agreement that required franchisees to comply with the owner's rules of operations and that gave the owner broad discretion to establish mandatory promotional programs. *Id.* at *4–5. The court held the owner could not unilaterally revise the operating agreement by imposing an increased franchise fee. *Id.* at *8. Unlike the clear unilateral revision in *Bird Hotel Corp.*, ADQ's mandatory ITP installation requires no revision to the Newer Form Operating Agreements. Instead, this requirement is consistent with the plain and unambiguous terms of the agreements, which authorize ADQ to periodically designate an approved EPOS System and immediately require that subfranchisees use only that EPOS System.

### B.    FSA

The FSA mandates that DQSA enforce ADQ's system standards and equipment requirements on DQSA's subfranchisees that serve food, even when ADQ changes its standards and requirements periodically. Section 3.1 states that "[DQSA] shall conduct [its] business and shall require [its] sublicensees to conduct their respective businesses in accordance with [ADQ]'s system standards." (Doc. 1-3 at 7.) Under Section 3.2, DQSA "*agrees to purchase and use, and to require that sublicensees likewise agree to purchase*

---

[8]  *See supra* note 7 and accompanying text.

***and use, . . . only equipment . . . approved by [ADQ].***" (*Id.* (emphasis added).) DQSA further agreed, under Section 3.3, "that any requirement, standard or specification prescribed by [ADQ] hereunder is subject to ***reasonable periodic modification*** or rescission by [ADQ] as may be necessary in [ADQ]'s reasonable judgment to adapt the System to changing conditions and competitive circumstances." (*Id.* at 8 (emphasis added).) In unambiguous language, the FSA states that DQSA must enforce ADQ's mandatory equipment standards, even when ADQ periodically modifies those standards.

DQSA advances two arguments against this reading of the agreements. First, it argues that FSA's Section 3.1 is vague and neither defines "standards" nor states a specific modernization requirement. (Doc. 33 at 14.) At the very least, "system standards" includes approved equipment, such as the ITP. The next subsection, also under the heading "Trademark Standards and Requirements," says as much: "[DQSA] agrees . . . to require that sublicensees . . . agree to purchase and use, . . . only equipment . . . approved by [ADQ]." (Doc. 1-3 at 7 (Section 3.2).) Sections 3.1 and 3.2, read together, establish that DQSA must enforce ADQ's system standards, including equipment requirements, on DQSA's subfranchisees. And DQSA does not argue (nor could it argue) that equipment excludes the EPOS System or ITP.[9]

Next, DQSA argues the 1960 Territory Agreements give ADQ no authority to control features of customer experience, such as the EPOS System or ITP. (Doc. 33 at 14.) Even if this were true,[10] the Territory Agreements do not govern the issues under dispute. ADQ does not rely on the Territory Agreements in asserting its right to require ITP installation. (Doc. 48 at 18.) Relevant here, ADQ contends, under the FSA, that DQSA must require that Food Locations install the ITP. (*Id.*) And it is undisputed that upon any inconsistency between the Territory Agreements and the FSA, the Territory Agreements

---

[9]  In its filings, DQSA often refers to the ITP as "ITP equipment." (*See, e.g.*, Docs. 33 at 7, 11; 46 at 7, 13.)

[10]  The parties dispute the extent of ADQ's authority under the 1960 Territory Agreements. (*See* Docs. 33 at 3; 44 at 24 n.10.)

govern the aspect of the dairy products and the FSA governs the aspect of food service.[11] (Docs. 34 ¶ 11; 45 ¶ 11; *see also* 1-3 at 5 (FSA Section 1.3).) ADQ thus has the right to set and modify standards for approved equipment used in the sale of food, including equipment such as the ITP. The plain and unambiguous terms of the FSA permit ADQ to require that DQSA immediately enforce ITP installation for its subfranchisees that serve food.

## IV.   Conclusion

DQSA bargained for permission to sublicense the international Dairy Queen brand. In return, ADQ asked for, among other things, control over the equipment used by DQSA's subfranchisees. DQSA agreed. This intent is reflected in the plain terms and context of the Newer Form Operating Agreements and the FSA. The Court will therefore effectuate that intent and direct DQSA to require that subfranchisees that fall under these agreements immediately install the ITP.

Accordingly,

**IT IS ORDERED:**

1.    DQSA's Motion for Summary Judgment and Request for Declaratory Judgment (Doc. 33) are **denied**.

2.    ADQ's Cross-Motion for Summary Judgment (Doc. 44) is **granted**.

3.    DQSA must enforce its subfranchisees' installation of the ITP (1) at all locations with Newer Form Operating Agreements; and (2) at all Food Locations pursuant to the 1985 FSA. DQSA must require that the subfranchisees in these two categories sign participation agreements on or before **September 4, 2023**, and complete the installation of the ITP on or before **December 31, 2023**.

//

//

---

[11]   For the same reason, the Older Form Operating Agreements also do not govern the issues under dispute. ADQ does not require ITP installation from subfranchisees with only the Older Form Operating Agreement. (*See* Doc. 44 at 23, 27.) ADQ only requires ITP installation from a subfranchisee with the Older Form Operating Agreement if it serves food and was sublicensed by DQSA under the FSA. (*See id.*)

4. The Clerk of Court shall enter judgment accordingly and close its file in this action.[12]

Dated this 6th day of July, 2023.

Honorable Jennifer G. Zipps
United States District Judge

---

[12] Should any party file a motion for an award of attorneys' fees, the parties are reminded that the Court's specific requirements for such motions are set forth in the Scheduling Order. (*See* Doc. 25 at 3–4.)